# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VERNA CURRY, ) | |
| ) | |
| Plaintiff, ) | Case No.: 10-cv-7153 |
| ) | |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant City of Chicago's motion for summary judgment [107]. For the reasons stated below, the Court grants Defendant's motion for summary judgment [107].

**I.      Background**

Plaintiff Verna Curry graduated from college with a B.S. degree in accounting in 1981 and was hired by Defendant City of Chicago in 1985 to work as an auditor in the Tax Division of the City's Department of Revenue. Plaintiff worked in the Department of Revenue ("Department" or "Revenue") during the entire time that she was employed by the City. Plaintiff resigned from City employment on June 29, 2012, because she "was 55, and it was time for retirement." Pl. Dep. at 9:23-10:8. She regularly received good performance evaluations.

Bea Reyna-Hickey became the Director of the Department of Revenue in approximately 2000 and held that position for 12 years. Hickey oversaw the Department's six divisions: Finance and Administration, Accounts Receivable, Street Operations, Administrative Adjudication, Payment Processing, and Tax. Phillip Cobb was the Department's Managing Deputy over the Accounts Receivable, Payment Processing, and Tax Divisions from late 2007 or

early 2008 until July 2011. William Cerney ("Cerney") was the Deputy Director of Revenue's Tax Division from 1985 until January 2011.

Plaintiff began her employment with the City as an Auditor I in Revenue's Tax Division. Plaintiff believes that Cerney, who interviewed her for the Auditor I position, hired her into that position. While in the Tax Division, Plaintiff was promoted to the Auditor II position in November 1986, the Auditor III position in March 1988, the Auditor IV position in April 1989, and the Supervisor of Auditing position in March 1990. As a Supervisor of Auditing, Plaintiff initially worked in the Tax Division under Cerney and then "went to two other sections within the Department of Revenue"—Customer Service, which was supervised by Deputy Director William Kenan, and another section that Plaintiff cannot recall, which was supervised by Paul Vallas. In approximately 2004, Plaintiff went from Customer Service to the Tax Division under Cerney.

In 2008, Plaintiff reported to Manager of Tax Policy Gary Michals and supervised two employees in the bulk sales and taxi medallion unit of the Tax Division. Plaintiff's subordinates audited businesses and taxi medallions that were sold in the City of Chicago, and Plaintiff reviewed their work. Seven other Supervisors of Accounting worked in the Tax Division in 2008: Jamesine Braxton, Charles Brown, Tim Yung, Elaine Herman, Mark Pekic, Maureen McInerney, and Robert Rachowicz. Other than Plaintiff, McInerney was the only Supervisor of Auditing who reported to Michals. McInerney supervised five employees in the real property transfer tax unit of the Tax Division.

In 2001, Plaintiff was diagnosed with spinocerebellar ataxia, an incurable progressive neurological disease. Plaintiff did not inform the City about her medical condition in 2001. In the summer of 2007, Plaintiff began having trouble writing, walking, and speaking. In

2

September 2007, Plaintiff spoke with Cerney about her medical leave. Cerney asked Plaintiff if she wanted to go on full disability, but she indicated that she "wanted to try short term first." Plaintiff requested and received a medical leave of absence for three months, from October 15, 2007 to January 16, 2008.

In January 2008, Plaintiff began to use a four wheel walker to assist her with walking. Although Plaintiff "could walk better" in 2008 "because of the physical therapy" that she received during her leave of absence, she could not walk without stumbling, her speaking ability did not improve, and her writing was "affected." Plaintiff testified that she decided at some point during the week of November 27, 2008, that she wanted to take medical leave in 2008.[1] During her deposition, Plaintiff testified that she had no reason to doubt that she told her doctor, Christopher Gomez, on November 21, 2008, that she was interested in going on disability because she had difficulty keeping up with her work. Plaintiff also testified that she had no reason to doubt that she told Dr. Gomez during the same visit that she was "finding it challenging to complete the same tasks as before." Plaintiff also informed another doctor, Deborah Burnet, on November 24, 2008, that she was "in the process of applying for disability."

Sometime in November 2008, Plaintiff learned from Cerney that "one of the supervisors was going to be laid off." On November 21, 2008, Plaintiff "found out" that she had been selected for layoff by comparing the 2008 budget for the Tax Division with the 2009 budget for that Division. Plaintiff noticed that "there was one supervisor in the 2009 budget, and two supervisors in the 2008 budget" under Michals, and therefore she asked Cerney if she was going to be laid off. Cerney told Plaintiff that "he knew who it was, but couldn't tell [her]," and that "[she] should speak with Mr. Cobb." During their November 21, 2008 telephone conversation,

---

[1] Plaintiff did not tell any City employee prior to December 2, 2008, that she wanted to take a medical leave of absence.

3

Cobb told Plaintiff, "Yes, it's you." Plaintiff did not ask Cobb or any other City employee why she had been selected for layoff or who had selected her for layoff, nor did she make a complaint to any City employee after her telephone conversation with Cobb.

Hickey made the decision to eliminate seven positions in Revenue during the December 31, 2008 citywide, budgetary reduction in force, pursuant to a directive from the City's Office of Budget and Management that Revenue cut its personnel budget. According to Hickey, she selected those positions because their elimination would have "the least impact" on the operations of the Department. According to her deposition testimony, Hickey did not consider seniority when deciding which non-union positions to eliminate during the December 2008 reduction in force because she "made the decision to look at middle management" and to eliminate "those [functional] areas where it would least impact [the Department's] operation[s]." Hickey "spread the reduction across the various divisions" of the Department. Hickey selected positions for elimination in the December 2008 reduction in force based on her review of organizational charts for the Department, and based on the information she knew or received regarding the "supervisor responsibilities in the various operating areas" of the Department. Hickey determined that the elimination of Plaintiff's position would have a minimal impact on the Department's operations because Plaintiff was a Supervisor of Auditing in the smallest unit of the Tax Division, which had several layers of supervision.

On December 2, 2008, Plaintiff received a reduction-in-force notice during a meeting with Cerney and Cobb, which took place in Cerney's office. The letter stated that she would be laid off on December 31, 2008. During that meeting, Plaintiff asked "if they had any problems with [her] going on disability," and Cobb responded, "No." Cobb and Cerney also told Plaintiff

that they wanted to "help" her by putting her on on medical leave instead of laying her off.[2]

On or about December 2, 2008, Plaintiff submitted a Request for Leave of Absence to the Department of Revenue. Plaintiff also submitted a Certification of Health Care Provider ("Certification"), which was signed by Dr. Gomez on December 1, 2008, and by Plaintiff on December 5, 2008. The December 1, 2008 Certification states, in part, that Plaintiff was "[u]nable to perform [her] duties," that she had "[d]ifficulty performing work related activities," and that she was "[u]nable to perform work." Plaintiff disagrees with the statements that she was "[u]nable to perform [her] duties" and that she had "[d]ifficulty performing work related activities"; however, Plaintiff did not ask Dr. Gomez why he indicated on the Certification that she was "[u]nable to perform [her] duties," because she "never reviewed the [C]ertification." Plaintiff testified that she did not review the Certification before she signed it or before she submitted it to the Department of Revenue because she was "sure that [her] doctor knew how to fill the form out," and because it was not important to her to review the Certification for accuracy.

Cerney and Hickey approved Plaintiff's December 2008 Request for Leave of Absence. Plaintiff was on a medical leave of absence from December 15 or 22, 2008, through her retirement on June 29, 2012. Plaintiff was not terminated. During that time period, Plaintiff submitted a request to extend her medical leave every three months, and she supported each request with a medical certification which indicated that she was unable to work or unable to perform all of her job duties. Plaintiff was an employee of the City while she was on medical

---

[2] Based on Plaintiff's deposition testimony, any conversation regarding Plaintiff's medical leave, in which Plaintiff, Cerney, and Cobb participated, must have occurred around the time of the December 2, 2008 meeting when she received the reduction-in-force notification. Plaintiff testified at her deposition that she did not have any conversations with Cobb after she received her reduction-in-force notice, and she stated that she had only one conversation with Cerney after that date regarding submitting her "papers" to the pension fund.

5

leave between December 2008 and June 2012. In January 2009, she received a cost of living pay increase. While on medical leave, as of January 1, 2009, Plaintiff received half of her salary. When she retired shortly after turning 55, she began receiving her pension of $5,546/month.

Plaintiff testified that she knew that it is a violation of the City's Personnel Rules to request or accept a leave of absence on fraudulent grounds. Dr. Gomez certified that Plaintiff was unable to perform her job duties as of December 1, 2008, "[b]ecause she has an incapacitating neurological diagnosis," which causes "gait imbalance, slurred speech, incoordination, and choking." Specifically, Dr. Gomez determined that the "difficult[y]" that Plaintiff has speaking on the phone due to her speech; the "challenges" of "getting to work, making deadlines, [and] getting from place to place inside her office"; and the "risks of [her] falling over inside her office" and "[h]er walker getting in the way" made her unable to perform her job duties.

Although Plaintiff testified that she believed that she had a serious medical condition (which her doctors confirmed), Plaintiff also testified that she believed she could continue to work. During her deposition, Plaintiff testified that she did not attempt to return to work after December 2008, because "[n]o one asked [her]," and because, around the time of her retirement, "[she] thought it might be a little challenging to try and return to work," "[g]iven [her] condition." However, the record is clear that Plaintiff never told her doctor after December 2, 2008, that she was able to return to work, nor did she request any medical documentation to show that she was able to return to work. Instead, she continued to submit medical certification which indicated that she was unable to work or unable to perform all of her job duties. Dr. Gomez testified that if Plaintiff had informed Dr. Gomez (or if he believed) that Plaintiff was

able to perform her job duties, he would not have certified that she was unable to perform her job duties.

City of Chicago Personnel Rule XI, Section 3, Paragraph (d), states, in part, that the City "is an employer subject to the federal Family and Medical Leave Act." The U.S. Department of Labor publication titled "Your Rights under the Family and Medical Leave Act of 1993," which is incorporated as an addendum to Personnel Rule XI, provides, in part, that "[u]npaid leave must be granted * * * for a serious health condition that makes the employee unable to perform the employee's job." Pursuant to Personnel Rule XI, Section 2, Paragraph (a), a City employee must apply for a leave of absence on "forms prescribed by the Commissioner of Human Resources," and the leave "must be approved" by the head of the employee's department before it begins. Personnel Rule XVIII, Section 1, Paragraph 10, prohibits City employees from "[r]equesting or accepting a leave of absence on fraudulent grounds."

Personnel Rule XIA, Section 3, states:

> If a non-Career Service employee is granted a leave of absence, the department head may, but shall not be obligated to, keep the position vacant and reinstate the employee upon termination of the leave if the person meets the qualifications for the position. The City's leave policies will be in compliance with applicable laws.

Personnel Rule XI, Section 2, Paragraph (e), provides that "[a]ll employees who return from leaves of absence shall, as a condition of their return, have the present ability to perform the required work without further training after a reasonable amount of orientation." Personnel Rule V states, in part, that "[a]ny employee with a complaint that she or he has been discriminated against on the basis of * * * disabled status * * * may process such complaint in accordance with either the Grievance Procedure, Rule XVI; the Discrimination Charge Procedure, Rule XVII; or the Disability Appeal Procedure, Rule XVIIA of these Rules." Plaintiff, who was a non-Career

7

Service, at-will City employee, received a copy of the City's Personnel Rules during "the course of [her] employment" with the City and reviewed the rules.

Plaintiff filed Charge of Discrimination with the Equal Employment Opportunity Commission on May 12, 2009. Plaintiff filed a two-count amended complaint in this matter on May 27, 2011. In her amended complaint, Plaintiff alleges that "[t]he decision to terminate [her] from employment was motivated in whole or in part by her disability," in violation of the Americans with Disabilities Act and the Rehabilitation Act. Further, Plaintiff believes that the decision to select her for layoff was based on her medical condition because Supervisors of Auditing who were not selected for layoff "had less seniority than [she] did, * * * [she] had done some of their jobs before, and [she] didn't see any other reason why [she] was being laid off except for [her] disability."

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue

8

for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**III. Analysis**

The Americans with Disabilities Act prohibits employers from taking adverse employment actions against their employees because of a disability. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012); see 42 U.S.C. § 12112(a). To establish a violation of the Act an employee must show "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009) (quoting *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)). Essentially the same elements must be proven to establish a violation of the Rehabilitation Act, which additionally

requires plaintiffs to prove that they were "involved in programs receiving federal financial assistance." *Silk v. City of Chi.*, 194 F.3d 788, 798 nn. 6 & 7 (7th Cir. 1999).

The ADA protects individuals only if they are "qualified individuals with a disability." See *Nowak v. St. Rita High School*, 142 F.3d 999, 1002-03 (7th Cir. 1998); see also *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000); *Silk*, 194 F.3d at 798; 42 U.S.C. § 12112(a)-(b); §12111(8). The parties do not dispute that Plaintiff is disabled as defined by the ADA. However, having a disability does not end the inquiry. Rather, under the ADA and the Rehabilitation Act, "a qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires." See *Nowak*, 142 F.3d at 1002-03 (quoting 42 U.S.C. § 12111(8)). Because Plaintiff bears the burden of proving that she is a "qualified individual," she must show that she was able to perform the essential duties of her job with or without an accommodation. *Id.* at 1003 (citing to *DeLuca v. Winer Indus.*, 53 F.3d 793, 797 n.3 (7th Cir. 1995)).

The record evidence makes clear that for the three and a half years that Plaintiff was on medical leave, Plaintiff represented that she was unable to work and the City had no evidence to suggest otherwise. During a December 2, 2008 meeting, after Plaintiff received the reduction-in-force notice, she asked Cerney and Cobb "if they had any problems with [her] going on disability," to which Cobb responded, "No." Further, on or around December 2, 2008, Plaintiff submitted a Request for Leave of Absence to the Department of Revenue with a Certification that was signed by both Dr. Gomez and Plaintiff. In the Certification, Dr. Gomez represented that Plaintiff was unable to work. Specifically, the Certification stated, in part, that Plaintiff was "[u]nable to perform [her] duties," that she had "[d]ifficulty performing work related activities,"

and that she was "[u]nable to perform work." According to Dr. Gomez, Plaintiff also was unable to perform her job duties "[b]ecause she has an incapacitating neurological diagnosis" which causes "gait imbalance, slurred speech, incoordination, and choking." Additionally, Dr. Gomez determined that Plaintiff was unable to work because of the "diffcult[y]" that she has speaking on the phone due to her speech; the "challenges" of "getting to work, making deadlines, [and] getting from place to place inside her office"; and the "risks of [her] falling over inside her office" and "[h]er walker getting in the way." Relying on the representations made by Plaintiff's doctor in the Certification, Cerney and Hickey approved Plaintiff's December 2008 Request for Leave of Absence, and Plaintiff went on a medical leave of absence beginning in December 2008.

Plaintiff remained on a medical leave of absence for approximately three and a half years, until her retirement on June 29, 2012. During those three and a half years, Plaintiff submitted a request to extend her medical leave every three months and supported each request with a Certification from her doctor that represented that she was unable to work. The representations made by Plaintiff and her doctor that she could not work "are relevant evidence of the extent of [her] disability." *Weigel v. Target Stores*, 122 F.3d 461, 467-68 (7th Cir. 1997). As the Seventh Circuit unequivocally stated:

> The point here is a simple one: When employees (and/or their physicians) represent that they are "totally disabled," "wholly unable to work," or some other variant to the same effect, employers and factfinders are entitled to take them at their word; and, such representations are relevant evidence of the extent of a plaintiff's disability, upon which an employer may rely in attempting to establish that an ADA plaintiff is not a "qualified individual with a disability."

*Id. Weigel* makes clear that the City was entitled to rely on the repeated certifications by Plaintiff and her doctor that she was unable to work.

Additionally, Plaintiff did not come forth with sufficient evidence showing that she told the City that she could perform the essential functions of her position while she was on leave, with or without a reasonable accommodation. Rather, Plaintiff continued for three and a half years to submit requests to extend her medical leave and certify that she was unable to work. She now contends that despite her certifications to the City that she was unable to work, she believed that she could continue to perform her job. The fatal problem for Plaintiff is that the record is devoid of evidence that she ever expressed that opinion to her employer and replete with certifications attesting to her inability to work.

As the Supreme Court stated in *Cleveland v. Policy Management Systems Corp.*, a "plaintiff's sworn assertion" that she is "'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation." 526 U.S. 795, 806 (1999). Here, Plaintiff fails to provide a sufficient explanation with respect to the contradiction between (i) the representations that she and her doctor made in certifications every three months for three and a half years that she was "unable to work" and (ii) her current position that she could have worked. Her excuses—"she did not know what was required to obtain medical leave," "no one ever questioned where she was entitled to leave," she didn't read the certification, and her doctor "did not know what [her] job duties were" when he filled out the form—are insufficient. If Plaintiff believed that she was able to perform the functions of her job between December 2008 and the day she retired, it was incumbent upon Plaintiff to let the City know. She did not, and she cannot now claim that the City discriminated against her for accepting her certifications that she was unable to work.

In short, Plaintiff claims in this litigation that she was able to perform all of her essential job duties, yet she represented for three and a half years to her employer that she was "unable to

work." Plaintiff cannot have it both ways: either she took a voluntary leave of absence because she was incapable of working, or she took leave that she did not believe she was entitled to in order to avoid a possible layoff. The record sufficiently reveals that, at a minimum, she represented to the City that she was not a qualified individual with a disability under the ADA, and the Court need not go further.[3] Because Plaintiff cannot establish that she was a qualified individual with a disability at the time she received the reduction-in-force notice, her disability discrimination claims fail.

IV. **Conclusion**

For these reasons, the Court grants Defendant City of Chicago's motion for summary judgment [107]. Judgment will be entered in favor of the City and against Plaintiff Verna Curry on all claims.

Dated: June 17, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

[3] The latter explanation—that Plaintiff submitted certifications to the City that she was unable to work when in fact she believed that she could—is even more troubling and likely would provide a legitimate, nondiscriminatory basis for her discharge, if she had been discharged. To claim that she submitted certifications without reading them, or to contend that the City should not have accepted her and her doctor's representations that she was unable to work, borders on disingenuous.